J-S47022-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| DWAYNE SMITH, | |
| Appellee | No. 2186 EDA 2013 |

Appeal from the Order Entered June 27, 2013
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0002062-2013

BEFORE:  MUNDY, OLSON AND WECHT, JJ.

MEMORANDUM BY OLSON, J.:                    **FILED SEPTEMBER 03, 2014**

Appellant, the Commonwealth of Pennsylvania (hereinafter "the Commonwealth"), appeals from an order entered on June 27, 2013 that granted a motion to suppress physical evidence filed by Appellee, Dwayne Smith (hereinafter "Appellee").  After careful consideration, we reverse and remand for additional proceedings.

The facts, as summarized by the trial court, are as follows:

> On December 27, 2012, at approximately 7:20 P.M., Officer [Konstantino] Apostolou's tour of duty took him to a residence at 4731 Salem Street, in Philadelphia.  Officer Apostolou had been a police officer for almost seven years at this time.  He was familiar with the area and described it as a violent, high crime neighborhood, with frequent shootings and narcotic sales.
>
> Officer Apostolou, along with three other officers, went to the Salem Street residence to look for a victim of a reported gang-related Molotov cocktail firebomb and shooting that had occurred at 600 Foulkrod Street in

Philadelphia. The officers arrived at the Salem Street address based upon information Sergeant Cerutti[1] had received. Officer Apostolou did not know what that information was, nor did he personally observe any signs of an individual in distress at the Salem Street property.

Sergeant Cerutti knocked on the door and announced the police's presence. Law enforcement did not have a search warrant for the property or the occupants. An individual named Keith Bennett, whom Sergeant Cerutti identified as the resident of the home, answered the door within approximately ten seconds of the knock. A few seconds after law enforcement explained that they were looking for a victim from the 600 Foulkrod Street incident, Mr. Bennett allowed the officers to "come in and check" the house.

Sergeant Cerutti entered first, followed by Officer Apostolou and two other officers. Upon entering the residence, Officer Apostolou observed approximately ten individuals, an estimated five of which were running out the back of the residence. Officer Apostolou also noticed [Appellee], who was a couple of feet away from him, leaning over and reaching his left hand down toward the bottom of a recliner. [Appellee] lifted his left hand and "shoved" it in his pocket. Officer Apostolou did not see anything in [Appellee's] hand. [Officer Apostolou] feared for his safety when, in conjunction with the individuals running out of the house, he saw [Appellee] put his hand in his pocket. After seeing this gesture, Officer Apostolou decided to stop and frisk [Appellee], at which point [Appellee] "was not free to leave." During the frisk, Officer Apostolou felt a handful-size "bundle" of objects. Based on his experience from hundreds of prior narcotics arrests, he "knew the bundle to be crack cocaine." Officer Apostolou handcuffed [Appellee], searched the left pocket of his pants, and recovered twenty-nine "yellow tinted, small baggies containing an off-white chunky substance." A seizure analysis confirmed that the substance was crack cocaine.

_____

[1] Sergeant Cerutti's first name is not contained in the certified record.

> Officer Apostolou also recovered $217.00 of United States currency from [Appellee's] person.

Trial Court Opinion, 11/5/2013, at 203 (record citations, brackets and footnotes omitted). As noted by the trial court, "[w]hile a firearm was also recovered from the residence, that [weapon was] not subject to the [suppression] motion." *Id.* at 3 n.3.

The Commonwealth charged Appellee with four firearm violations, two narcotics charges, and possessing an instrument of crime.[2] On May 24, 2013, Appellee filed a motion to suppress the narcotics and cash seized from his person, but not the firearm which was also recovered.[3] The trial court held a suppression hearing on June 13, 2013, wherein Officer Apostolou and Appellee testified. On June 27, 2013, the trial court granted Appellee's motion. This timely appeal resulted.[4]

_____

[2] 18 Pa.C.S.A. §§ 6105(a)(prohibited possession of a firearm), 6106(a)(1)(firearms not to be carried without a license), 6106.1(a)(carrying a loaded weapon), 6108 (carrying a firearm on public streets or property in Philadelphia); 35 P.S. §§ 780-113(a)(30)(possession of a controlled substance with intent to deliver) and 780-113(a)(16)(intentional possession of a controlled substance); 18 Pa.C.S.A. § 907 (possession of an instrument of crime).

[3] Counsel for Appellee stated that Appellee did not "seek to suppress [the firearm] because it was not his house [and] [i]t was not found on his person." N.T., 6/13/2013, at 4. Counsel believed Appellee lacked standing and/or lacked a reasonable expectation of privacy. *Id.* Thus, the firearm is not at issue herein.

[4] The Commonwealth filed a notice of appeal on July 29, 2013. Because the 30-day appeal period fell on a Saturday, the Commonwealth's notice of appeal was timely filed on Monday, July 29, 2013. *See* 1 Pa.C.S.A. § 1908 (computation of time). In its notice of appeal, the Commonwealth certified

*(Footnote Continued Next Page)*

On appeal, the Commonwealth presents the following issue for our review:

> Did the lower court err in suppressing evidence on the ground that there was no reasonable suspicion for a **Terry**[5] frisk where police responded to a report of a firebomb/shooting victim entering an address in a high crime area, entered with permission, saw a large group of occupants, many of whom fled through the back of the house, and [Appellee], seated on a recliner, made reaching motions toward the floor and toward his pants pocket?

Commonwealth's Brief at 4.

The Commonwealth contends that the trial court "erred in suppressing evidence because it evaluated the circumstances in isolation and focused on factors not present" instead of "evaluating the totality of the circumstances[.]" *Id.* at 7. The Commonwealth argues that officers entered a home with consent and were thrust into "a chaotic situation" with multiple people "running out of the rear exit of the home[.]" *Id.* at 8. The officers knew they were in a high crime area and were investigating a "recent gang-related violent crime" and that such "circumstances were highly relevant to determining the validity of the [subsequent] frisk." *Id.* at 10-11. Thus, the Commonwealth maintains that "Officer Apostolou had reasonable suspicion

*(Footnote Continued)* ─────────

that the suppression order terminated or substantially handicapped the prosecution as required. *See* Pa.R.A.P. 311(d). Simultaneously with its notice of appeal, the Commonwealth filed a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on November 5, 2013.

[5] **Terry v. Ohio**, 392 U.S. 1 (1968).

to believe that [Appellee] was armed and dangerous when he reached to the floor under the recliner he was sitting on and then to his pants pocket." *Id.* at 8. The Commonwealth points to other cases dealing with "car stop investigation[s]" to support its contention that Appellee's furtive movements warranted a protective frisk by police pursuant to *Terry*. *Id.* at 12-13. The Commonwealth avers that the trial court erred by focusing on the facts that Appellee did not flee and that Officer Apostolou did not see an object in Appellee's hand. *Id.* at 14.

Our standard of review is as follows:

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

*Commonwealth v. Boulware*, 876 A.2d 440, 442 (Pa. Super. 2005) (internal citation omitted).

Regarding protective frisks under *Terry*, this Court has previously stated:

> It is hornbook law that the Fourth Amendment to the United States Constitution as well as Article I, § 8 of the Pennsylvania Constitution protect citizens from unreasonable searches and seizures. Warrantless searches and seizures (such as occurred in this case) are unreasonable *per se,* unless conducted pursuant to

specifically established and well-delineated exceptions to the warrant requirement. One such exception, the *Terry* "stop and frisk," permits a police officer to briefly detain a citizen for investigatory purposes if the officer observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot.

*Terry* further held that when an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others the officer may conduct a pat down search to determine whether the person is in fact carrying a weapon. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.

*Commonwealth v. Simmons*, 17 A.3d 399, 402-403 (Pa. Super. 2011) (internal citations omitted).

Our Supreme Court has stated:

The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or the safety of others was in danger. The existence of reasonable suspicion to frisk an individual must be judged in light of the totality of the circumstances confronting the officer.

*Commonwealth v. Taylor*, 771 A.2d 1261, 1268–1269 (Pa. 2001).

We have previously determined that "suspicious gestures and movements, in conjunction with the fact that [the defendant] placed his hands inside his coat pocket as if he were reaching for something, could lead [police] to reasonably conclude that [their] safety was in jeopardy." *Commonwealth v. Wilson*, 927 A.2d 279, 284-285 (Pa. Super. 2007). "The pertinent analysis does not involve the number of actions performed by a person, but rather the nature of those actions. Where a person performs

- 6 -

an activity that is indicative of an attempt to secrete a weapon, that movement, regardless of whether it is singular or multiple, can support a belief that the person has a gun." ***Commonwealth v. Tuggles***, 58 A.3d 840, 844 (Pa. Super. 2012). "[I]f a suspect engages in hand movements that police know, based on their experience, are associated with the secreting of a weapon, those movements will buttress the legitimacy of a protective weapons search of the location where the hand movements occurred." ***In Interest of O.J.,*** 958 A.2d 561 (Pa. Super. 2008) (*en banc*).[6] Moreover, "whether the defendant was located in a high crime area similarly supports the existence of reasonable suspicion." ***Commonwealth v. Foglia***,

_____

[6] Appellee cites to ***Commonwealth v. Cooper***, 994 A.2d 589 (Pa. Super. 2010), *appeal denied*, 13 A.3d 474 (Pa. 2010) as support for his argument that Appellee's hand movements did not support a reasonable belief that he was armed and dangerous at the time of the frisk. Appellee's brief at 6-7. The facts and circumstances in ***Cooper***, however, are clearly distinguishable from the instant case. In ***Cooper***, police officers were patrolling a neighborhood at 9:00 a.m. because of complaints that people were stealing copper from street dumpsters. The appellant was observed standing next to a dumpster. As an officer approached the appellant, the appellant "reached for his pocket", however, before the appellant put his hand in his pocket the officer ordered him to stop and he complied. In looking at the totality of the circumstances, this Court determined that "[b]ased on this sparse record, we are unable to conclude that [a]ppellant's mere movement toward his pocket in broad daylight gave the officer reason to believe [a]ppellant was armed and dangerous…". ***Id.*** at 594. In reaching this conclusion, we noted that the incident occurred at 9:00 a.m., there was no testimony that the appellant was in a dangerous neighborhood, the officers simply found the appellant next to a dumpster where he was in no position to retrieve a weapon, and the appellant merely moved toward his pocket but did not actually reach into his pocket. ***Id.*** The totality of circumstances in the case *sub judice* are significantly different.

979 A.2d 357, 361 (Pa. Super. 2009) (*en banc*), *appeal denied*, 990 A.2d 727 (Pa. 2010).

Here, the trial court concluded that Officer Apotolou's protective frisk was unlawful and opined as follows:

> At the suppression hearing in this case, Officer Apostolou's testimony failed to articulate a reasonable belief that [Appellee] was armed and dangerous at the time of the frisk. The interaction between Officer Apostolou and [Appellee] took place inside a residence located in a high crime neighborhood after an incident thought to be gang related. At the time of the interaction, however, Officer Apostolou also testified that he was looking for a victim of the crime, not the perpetrator of the crime. Officer Apostolou also testified that he became concerned for his safety when he saw approximately five individuals fleeing, he saw [Appellee] reach his left hand down toward the floor and then shove that hand into his pocket. Officer Apostolou, however, who was just a couple of feet from [Appellee], did not see anything in [Appellee's] hand, nor did he testify to seeing anything protruding or bulging on [Appellee's] person indicating that he was armed with something dangerous. Because Officer Apostolou failed to articulate specific facts giving rise to a reasonable belief that [Appellee] was armed and dangerous at the time of the frisk, the frisk itself was unlawful.

Trial Court Opinion, 11/5/2013, at 4 (citations, quotations, and bracket omitted).

Upon review of the record, we conclude that the trial court erred as a matter of law by failing to view the totality of the circumstances as presented by the Commonwealth. Officer Apostolou testified, without contradiction, that police were responding to gang-related violence including a firebombing and shooting. N.T., 6/13/2013, at 8. He characterized the

neighborhood, which was where he had grown up, as a "[v]iolent, high crime area, [with] a lot of shooting [and] a lot of narcotic sales." *Id.* at 7. Upon entering the subject property with consent from the resident, Officer Apostolou could "see people ahead of [him] running out of the building." *Id.* at 10. While Officer Apostolou acknowledged that police were looking for a potential victim of the reported violence, he testified "[a]t that point, when we went in, due to people running out the back and due to the fact that we were outnumbered, I was concerned for my safety." *Id.* at 27. Appellee, seated in a recliner nearby, was "leaning over the recliner with his left hand" making a downward motion toward the bottom of the recliner. *Id.* Later, upon cross-examination, Officer Apostolou testified that Appellee "was actually leaning on the recliner. And his left hand was leaning on the ground where he was placing an object." *Id.* at 27. Officer Apostolou did not see a firearm. *Id.* Immediately thereafter, "[Appellee] takes his left hand and shoves it into his pocket." *Id.* at 11. Officer Aposotlou decided to conduct a frisk for his safety, because he saw Appellee put his hand in his pocket.[7] *Id.*

_____

[7] Appellee testified on his own behalf. He testified, in contrast to Officer Apostolou, that when a resident of the subject house, Keith, answered the door "somebody pushed the door open" and "the Sergeant jumped on [Keith] and tackled him down. N.T., 6/13/2013, at 39. He further testified that three police officers came into the residence and swept through the dwelling. *Id.* He claims that one of the police officers "put his gun to [Appellee's] head and started patting [Appellee] down immediately." *Id.* Appellee testified that he was taken to the kitchen and police "started ripping the place up." *Id.* at 41. Police uncovered the firearm and police told Appellee "because [he] was close to it, [the police] were going to charge

*(Footnote Continued Next Page)*

Here, it is undisputed that police were in a high-crime area in response to gang-related violence. Although the police were admittedly looking for the victim of a violent crime, this did not preclude the possibility that they might encounter an armed and dangerous individual. Moreover, under the circumstances, it would not be unreasonable for them to fear for their safety when investigating. Certainly, a victim of gang-violence could have been armed or even provoked the altercation in his or her own right. In addition, the overall chaotic scenario that police entered into, with multiple people fleeing the scene, contributed to Officer Apostolou's concern for potentially armed and dangerous individuals.

Most importantly, Officer Apostolou testified, unequivocally and without dispute, that he witnessed Appellee make two separate furtive movements – one toward the bottom of the chair upon which he was seated;[8] the other motion occurred when Appellee placed his left hand in his pocket. Both locations were potential locations to secrete a weapon. While Officer Apostolou did not see an actual weapon, he was not required to "be

_(Footnote Continued)_ _____

[Appellee] with it." **Id.** The factual findings made by the trial court as announced in open court on June 27, 2013 and as set forth in its 1925(a) opinion do not comport with Appellee's testimony. We are bound by the trial court's factual findingsg. **Boulware**, 876 A.2d at 442 ("The suppression court's findings of fact bind an appellate court if the record supports those findings.")

[8] Police discovered a loaded firearm "underneath a piece of furniture that [Appellee] was in or about." N.T., 5/17/2013, at 2-3. However, as indicated above, the gun was not the subject of Appellee's motion to suppress.

absolutely certain that the individual is armed[,]" it was enough for him to reasonably "belie[ve] that his safety or the safety of others was in danger." *Taylor*, 771 A.2d at 1268–1269. Taking all the evidence together, we conclude that the Commonwealth presented evidence showing the circumstances warranted Officer Apostolou's belief that his safety or the safety of others was in danger. Thus, Officer Apostolou possessed a reasonable suspicion to conduct a lawful frisk of Appellee pursuant to *Terry*. Hence, we reverse the order granting suppress and remand this matter for trial.

Order reversed. Remanded for additional proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/3/2014